Roksana D. Moradi-Brovia (Bar No. 266572)
W. Sloan Youkstetter (Bar No. 296681)
**RHM LAW LLP**
17609 Ventura Blvd., Suite 314
Encino, CA 91316
**Telephone:** (818) 285-0100
**Facsimile:** (818) 855-7013
roksana@RHMFirm.com
sloan@RHMFirm.com

*Attorneys for Debtor*
SASH GROUP, INCORPORATED

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re<br><br>SASH GROUP, INCORPORATED,<br><br>Debtor and Debtor-in-Possession. | Case No. 25-01150-CL11<br><br>Chapter 11<br><br>**MOTION TO APPROVE SETTLEMENT AGREEMENT TERM SHEET BETWEEN THE DEBTOR, NICHOLE MACDONALD. AND MANUFACTURED NETWORKS INC.; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF NICHOLE MACDONALD IN SUPPORT THEREOF**<br><br>Date: August 31, 2026<br>Time: 10:00 a.m.<br>Place: Courtroom 218<br>325 West F Street<br>San Diego, CA 92101 |

**TO THE HONORABLE CHIEF JUDGE CHRISTOPHER B. LATHAM UNITED STATES BANKRUPTCY JUDGE; THE UNITED STATES TRUSTEE; CREDITORS AND ALL PARTIES IN INTEREST:**

SASH GROUP, INCORPORATED, the “Debtor” and “Debtor-in-Possession” in the above-stated case, will and does hereby move the Court for entry of an order approving this *Motion to Approve Settlement Agreement Term Sheet*, pursuant to Rule 9019 of the *Fed. R. of Bank. Proc.*

## TABLE OF CONTENTS

**MEMORANDUM OF POINTS AND AUTHORITIES** ..... 3
I. INTRODUCTION ..... 3
II. SUMMARY OF THE AGREEMENT ..... 3
III. STATEMENT OF FACTS ..... 5
  *A. Prepetition* ..... 5
  *B. Postpetition* ..... 6
IV. ARGUMENT ..... 9
  *A. The Court May Approve a Settlement of a Pending Controversy* ..... 9
    1. The probability of success in litigation ..... 11
    2. The difficulties, if any, to be encountered in the matter of collection. ..... 11
    3. The complexity of the litigation involved and the expense; inconvenience and delay necessarily attending it ..... 12
    4. The paramount interest of the creditors and a proper deference to their reasonable views ..... 12
  *B. The financial impact upon the estate* ..... 13
**DECLARATION OF NICHOLE MACDONALD** ..... 15

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

SASH GROUP, INCORPORATED, the "Debtor" and "Debtor-in-Possession" ("DIP"") herein, filed its Chapter 11 case on March 25, 2025.

The Debtor continues to operate and manage its affairs as the DIP pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

The Debtor has entered into a settlement term sheet with Manufactured Networks Inc. ("MFD") and Nichole MacDonald that intends to globally resolve all the pending issues. Those terms and conditions are set forth in the Settlement Agreement Term Sheet (the "Term Sheet") between the parties. Attached as **Exhibit "A"** and incorporated herein is the Term Sheet.

The Debtor believes that the parties will enter into a definitive agreement to the Term Sheet prior to the hearing on this Motion. However, the parties desire to disclose the general terms of the settlement and move the case forward. As such, the Term Sheet is serving as a proxy while the agreement is finalized. The Debtor will file a supplement to this motion with the fully executed agreement when completed.

## II. SUMMARY OF THE AGREEMENT

Pursuant to the Term Sheet, the parties have agreed to the following material terms:

- Settled Secured Claim Amount - $2.325M plus all accrued and unpaid interest thereon at a rate of 8% compounded quarterly from the Effective Date until paid or deemed satisfied pursuant to this Agreement (the "Agreed Claim") which shall be secured by liens against all assets of SASH, including, without limitation, all intellectual property, customer lists, and sales channels, which is senior in priority to all other liens except the liens of the U.S. Small Business Administration.

RHM LAW LLP

- Upon any uncured event of default by SASH, the Agreed Claim shall automatically revert to $4,662,370.80, plus all accrued and unpaid interest therein at the same rate, from the Effective Date until paid in full.
- SASH and Ms. MacDonald shall grant MFD an exclusive, worldwide, three (3) year license to operate manufacture, sell, and distribute and to use all associated intellectual property, including trademarks, copyrights, and customer lists, subject to Brand Guidelines (the "License"), provided, however, that to the extent the Agreed Claim with interest is not satisfied in full within the initial three year license term, MFD shall be entitled to two (2) one (1) year options (collectively, the "License Term") for MFD to extend the term of the License, in satisfaction of the Agreed Claim plus interest during the License term, except for the amount otherwise agreed to herein. The Agreed Claim including accrued interest, shall be deemed satisfied solely upon full performance by MFD through the License Term.
- Upon expiration of the License Term (including MFD's two (2) one (1) year options), MFD's Agreed Claim and Claim Amount shall be deemed paid, satisfied, and discharged in full, and Sash shall have no further obligation to MFD.
- MFD shall remit to SASH on a monthly basis a Royalty Payment. Commencing on the date that is six months after entry the Final Order, MFD shall pay SASH the greater of a royalty of 10% or $5,000 of the gross monthly revenue each month (the "Royalty Payment"). The Royalty Payment shall be due and payable within thirty days of the closing of the month (for example, the Royalty Payment for January will be due and payable thirty days after the end of January). Notwithstanding the foregoing, during the first six (6) calendar months following entry of the Final Order, MFD shall pay to SASH a monthly royalty of $5,000 per month.

The Term Sheet contains other terms, conditions, and provisions.

///

## III. STATEMENT OF FACTS

*A. Prepetition*

The Debtor was formed in 2012 and manufactures, sells, and distributes a unique type of handbag, called Sash Bags, and other retail products. The Sash Bags are sold directly to customers through its website and Amazon.

Historically, the Debtor used a manufacturing partner located in India to directly manufacture its products pursuant to purchase orders ("POs"). The Debtor would pay the manufacturer a 50% deposit when a PO was submitted and pay the balance when the products were shipped. Once the products were ready to be shipped, the Debtor would put the product on the websites for sale. The Debtor then shipped the products to a warehouse in San Diego and a fulfillment center in British Columbia, Canada. The products were shipped directly to the customers from the warehouses located in San Diego and Canada once purchased by customers on the websites.

In an effort to reduce the cost of goods sold ("COGS"), the Debtor entered into a contract with MFD to provide manufacturing logistics services in or around June of 2022. The Debtor would submit POs to MFD and MFD was supposed to ensure that the products were produced and shipped to the Debtor in a timely fashion. MFD did not require payment in full when the POs were completed and shipped.

The Debtor and MFD experienced a substantial disconnect on pricing and fees from the very beginning of the relationship. A dispute later arose between the Debtor and MFD regarding operational issues, such as delays for receiving the "Sash" products, the Debtor being required to submit new POs for its products where it previously submitted POs for those same products but went unfulfilled, and the fees and costs from the performed POs. As a result, MFD stopped accepting new POs and stopped shipping the performed POs without cash on delivery.

///

///

As an attempt to "restart" the relationship, the parties entered into a new agreement entitled "Master Goods and Services Supply – Secured and FBO Agreement" on December 6, 2023 (the "FBO Contract").

Thereafter, a subsequent dispute arose between the parties about payment, cash application, and reconciliation of amounts due.

From October through December 2024, the parties continued to entertain discussions regarding settlement of the dispute, but no resolution was reached.

In or around March 2025, the Debtor again attempted to negotiate a resolution with MFD. However, soon thereafter, MFD swiftly moved to foreclose on its security interest and sent a private sale notice to Debtor. In response, the Debtor filed this bankruptcy case prior to the expiration of the private sale date.

*B. Postpetition*

The parties have several pending matters and controversies in the underlying bankruptcy case and the adversary relating to the claim held by MFD, as follows:

- The Debtor and MFD dispute the amount of MFD's true claim.
- MFD seeks allowance to file a late proof of claim after missing the deadline to file a claim. MFD filed a *Motion for Entry of an Order: (1) Authorizing Filing of Proof of Claim After Bar Date and Deeming it to Have Been Timely Filed, Or Altering Bar Date; or, Alternatively (2) Deeming Manufactured Networks, Inc. to Have Timely Filed an Informal Proof of Claim and Authorizing Filing of Proof of Claim as Timely Amendment Thereto* on October 15, 2025 [Docket No. 179]; the Debtor filed an *Opposition* on November 24, 2025 [Docket No. 217].
- While the Debtor was waiting for MFD to produce documents that were required by the Debtor's forensic accountant to produce a report to allow the parties to proceed to mediation, MFD filed an adversary proceeding against the Debtor. The Debtor sought production from MFD pursuant to the order on a 2004 examination [Docket

No. 153], which required to Debtor to file and serve a notice of subpoena [Docket No. 155]. MFD filed a *First Amended Complaint for (1) Determination of Validity, Priority or Extent of Security Interest, Lien and Interest in Estate Property; (2) Declaratory Relief* against the Debtor on August 12, 2025 [Docket No. 5 in Adv. No.: 3:25-ap-90097-CL]; the Debtor filed an *Answer* on May 29, 2026 [Docket No. 34].

- MFD is also holding products with the Sash trademark, located at a warehouse in Valencia, California (the "Valencia Warehouse") that it now seeks to sell. MFD filed a *Motion for Entry of an Order Authorizing Manufactured Networks, Inc. to Sell Inventory Not Purchased or Owned by the Debtor and Granting Relief from the Automatic Stay to the Extent the Automatic Stay Applies to Sell Inventory that Does Not Belong to the Debtor* on November 17, 2025 [Docket No. 209]; the Debtor filed a *Limited Opposition* on December 1, 2026 [Docket No. 228]. Concurrently, MFD filed a *Motion for Relief from Automatic Stay – Personal Property* on November 17, 2025 [Docket No. 212]; the Debtor filed an *Opposition* on December 1, 2026 [Docket No. 226].
- The Debtor's management formed a third-party manufacturing and sourcing company from which the Debtor can purchase inventory. The Debtor filed a *Notice of Intended Action and Opportunity for Hearing to Seek Allowance of Compensation or Remuneration to Debtor(s) or Insiders as Provided by LBR 4002-2* on December 19, 2025 [Docket No. 242]; MFD filed an *Opposition* on January 23, 2026 [Docket No. 264].
- Debtor and MFD attended several full-day mediations in December 2025 in an attempt to work out a framework for settlement. The settlement discussions did not ultimately result in a settlement, but did create an alignment on structure.

The Debtor and MFD have extended/continued the deadlines/hearings several times while the parties have continued negotiations of the Term Sheet.

Financially, the Debtor has struggled for a variety of reasons postpetition. Early in the case, the Debtor had difficulty paying for and running ads for a few weeks when it had to close its prepetition accounts and open DIP accounts as the bank to which it opened the DIP accounts would not issue a debit card, along with other account restrictions. Historically, the Debtor paid for all its advertising/marketing with a card.

As a result, the Debtor had to open DIP accounts at another bank that would issue debit cards, which was issued a few weeks after the accounts were opened. As such, this prevented the Debtor from adequately advertising/marketing the Sash Products for the first month of the case and it was stuck in a vicious cycle where it did not have sufficient working capital to pay them. The Debtor believes that advertising/marketing is critical to the success of the business as the Debtor believes that the more it spends for this purpose, the more sales it can generate. The Debtor relies on repeat customers, and the ads are the most efficient means to show what new products the Debtor can offer. As such, the Debtor has not met projected cash collateral budget as to advertising/marketing, which the Debtor believes has directly caused lower than projected sales.

Concurrently, the Canadian Fulfillment allegedly held a warehouseman lien on the Debtor's products located at its facility and would not allow the Debtor to sell those products until its prepetition claim was paid in full. The fulfillment center held approximately 5,721 Sash Bags and other non-Sash Bags inventory with a retail value of $212,656.10. After the parties entered into a settlement to resolve the issues, the Debtor timely filed a motion to approve settlement [Docket No. 107]; thereafter MFD filed an opposition [Docket No. 121], which significantly contributed to the delay of the consummation of the settlement until early October.

As to the ordering and selling of the new products, the Debtor reverted back to its model of ordering directly from the manufacturer(s), generally from India. However, there were considerable delays with ordering new products as it did not have the working capital to make those purchases. The Debtor did not receive any new products until July or

August 2025. As such, the Debtor was forced to sell only what it had on hand during this period, which was significantly limited.

Additionally, Debtor has been also drastically affected by the tariffs unilaterally imposed by the United States on India and other foreign nations. As a result, the Debtor had to find other means to get its products as it could no longer afford the order directly from an overseas manufacturer; the additional 50% tariffs brought its total duties to 63.5%.

## IV. <u>ARGUMENT</u>

### *A. The Court May Approve a Settlement of a Pending Controversy*

Rule 9019 of the *Fed. R. of Bank. Proc.* ("FRBP") authorizes a trustee (or debtor-in-possession) to settle a controversy upon filing of a motion to approve the compromise, and the court has the authority to decide whether to approve a settlement of claims held by a bankruptcy estate. The Term Sheet herein represents such a compromise.

It is well-established that a compromise should be approved if it is "in the best interest of the estate . . . and is fair and equitable for the creditors." *Schmitt v. Ulrich* (*In re Schmitt*), 215 B.R. 417, 424 (B.A.P. 9th Cir. 1997); *ATKN Company v. Guy F. Atkinson Company of California* (*In re Guy F. Atkinson Company*), 242 B.R 497, 502 (B.A.P. 9th Cir. 1999) ("At its base, the approval of a settlement turns on the question of whether the compromise is in the best interest of the estate.")

The Ninth Circuit has long recognized that "[t]he bankruptcy court has great latitude in approving compromise agreements." *In re Woodson*, 839 F.2d 610, 620 (9th Cir. 1988).

Accordingly, in approving a settlement agreement, the court need not conduct an exhaustive investigation of the claims sought to be compromised. *See In re Walsh Constr., Inc.*, 669 F.2d 1325, 1328 (9th Cir. 1982). Rather, it is sufficient that the court finds that the settlement was negotiated in good faith and is reasonable, fair, and equitable. *See A&C*

*Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986); *see also In re Am. Bldg. Storage*, 285 Fed. Appx. 375 (9th Cir. 2008).

Finally, while creditors' objections to a compromise must be afforded due deference, such objections are not controlling. *In re The General Store of Beverly Hills*, 11 B.R. 539, 541 (B.A.P. 9th Cir. 1981).

Traditionally, in evaluating whether to approve a compromise, courts in the Ninth Circuit must consider the following:

(a) The probability of success in litigation;

(b) the difficulties, if any, to be encountered in the matter of collection;

(c) the complexity of the litigation involved and the expense; inconvenience and delay necessarily attending it; and

(d) the paramount interest of the creditors and a proper deference to their reasonable views.

*A&C Properties*, 784 F.2d at 1381.

In considering these factors, courts are guided by two principles. First, “the law favors compromise.” *In re Blair*, 538 F.2d 849, 851 (9th Cir. 1976). Compromises are favored in bankruptcy and have become “a normal part of the process of reorganization”. *Protective Committee for Independent Stockholders of TMT Trailer Ferry Inc. v. Anderson*, 390 U.S. 414, 424, (1968) (*quoting Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)). Second, a compromise should be approved unless it “fall[s] below the lowest point in the range of reasonableness.” *In re W.T. Grant Co.*, 699 F.2d599, 608 (2d Cir. 1983).

Moreover, when considering these factors, the court need only canvass the issues, “a mini trial on the merits is not required.” *Schmidtt*, 215 B.R. at 423. Although a court is to consider the range of results in the litigation, “the court’s assessment does not require resolution of the issues, but only their identification, so that the reasonableness of the

settlement may be evaluated." *In re Hermitage Inn, Inc.*, 66 B.R. 71, 72 (Bankr. D. Colo. 1986).

Here, the Debtor believes that the settlement with MFD is in the best interest of the estate, and fair and equitable for the creditors, as follows:

1. <u>The probability of success in litigation</u>

Although the Debtor believes that it will ultimately prevail in various pending matters, including the adversary, the nature of litigation is inherently risky and expensive. The core issue in dispute is the amount of MFD's claim and the conduct during the performance of the agreement. As such, the Debtor believes that MFD has and will continue to fervently pursue its claims against the Debtor. As a result, the Debtor has incurred significant administrative fees and will continue to accrue significant fees absent a settlement. Even if the Debtor does prevail, the continued cost to litigate will render it administratively insolvent and unable to propose a feasible amended Chapter 11 plan of reorganization.

More importantly, the Debtor simply does not have the resources to continue to litigate as sales have been slow postpetition as shown by the monthly operating reports, and it believes that settling with MFD is the only way forward for the business.

In the Debtor's business judgment, it believes that the upside in potentially prevailing does not significantly outweigh the potential downside with the cost of continuing to litigate with MFD as it will only be a Pyrrhic victory.

2. <u>The difficulties, if any, to be encountered in the matter of collection</u>.

Generally, collection against any party is uncertain. However, the Debtor will remain liable for some portion of MFD's claim, which will be considerable even if the Debtor successfully reduces the amount. At best, the Debtor could offset the liability with any potential claims against MFD.

Nonetheless, the Debtor believes that MFD will appeal any negative ruling(s) and the litigation could drag on indefinitely. This Term Sheet, and then a fully executed settlement agreement, will provide resolution and certainty for both parties.

3. <u>The complexity of the litigation involved and the expense; inconvenience and delay necessarily attending it</u>

The litigation will be complex and expensive because the underlying issues are factually intensive as they relate to the interpretation of the FBO Agreement and the accounting for the various invoices over several years.

The continuation of the litigation also means that the Debtor will continue to accrue significant attorney fees as the parties would need to conduct discovery, including any discovery disputes, and retain experts for trial. As stated previously, the Debtor and MFD will fervently pursue the various actions, and they will likely appeal any negative rulings, which could drag on indefinitely. Therefore, the litigation may take years to conclude and be extraordinarily expensive if the Debtor had the funds to continue to litigate.

Further, the Debtor's current sales/working capital cannot fund the litigation in addition to the ordinary costs to operate the business.

4. <u>The paramount interest of the creditors and a proper deference to their reasonable views</u>

This settlement completely resolves the pending issues with MFD.

As part of the settlement, the Debtor is allowing MFD to operate, manufacture, sell, and distribute its products, and to use its all associated intellectual property for three years with two one-year options. In exchange, the Debtor is getting monthly royalties of not less than $5,000 per month or 10% of the gross revenue each month, whichever is more.

Those payments will be used to fund an amended Chapter 11 plan of reorganization. Otherwise, the Debtor is currently not generating sufficient revenue or disposable income

to propose a feasible plan based on the estimated administrative claims and the priority claims.

Further, in a situation where the case is converted to Chapter 7, the secured creditors have claims totaling approximately $5,127,000 and it is unlikely that a Chapter 7 trustee could sell the remaining assets of the estate in excess of the secured claims in order to generate a distribution to the administrative, priority, and then the general unsecured claims. *See* Docket Nos. 39 and 304.

As such, if the Debtor does not resolve the issues with MFD, the unsecured creditors of the estate will receive nothing. Therefore, the settlement allows the case to move forward and for all creditors to get paid something.

*B. The financial impact upon the estate*

Pursuant to Local Bankruptcy Rule 9019-1, motions governed by Rule 9019 must describe the financial impact upon the estate.

The Debtor is reducing MFD's claim from $4,662,370.80 to $2,325,000 (a reduction of approximately 50.13%). However, the Debtor is not directly paying this claim as it will paid directly from the sales while MFD operates the business from three to potentially five years. Upon completion of the settlement, MFD's claim will be fully satisfied.

More importantly, the Debtor is getting monthly royalties of not less than $5,000 per month or 10% of the gross revenue each month, whichever is more, while MFD operates the business. As stated previously, these payments will be used to fund a plan.

///

///

///

///

///

WHEREFORE, the Debtor respectfully requests that the Court approve the Motion and grant such other and further relief as is just and proper under the circumstances.

Dated: July 31, 2026

**RHM LAW LLP**

**By: /s/ Roksana D. Moradi-Brovia**
**Roksana D. Moradi-Brovia**
**W. Sloan Youkstetter**
*Attorneys for Debtor*
SASH GROUP, INCORPORATED

## DECLARATION OF NICHOLE MACDONALD

I, Nichole Macdonald, declare as follows:

1. I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would testify competently with respect thereto. Where facts are alleged upon information and belief, I believe them to be true.

2. I am a shareholder and the Chief Executive Officer of SASH GROUP, INCORPORATED, the "Debtor" and "Debtor-in-Possession" in the above-captioned case. I am authorized to make decisions for the Debtor.

3. I am the custodian of the Debtor's books, records, and documents. The Debtor maintains records of its transactions in the regular course of business, and it is the Debtor's practice and procedure to maintain records and to record transactions, acts, and events at or about the time the transaction occurs. The Debtor relies on these records in connection with its business dealings.

4. The Debtor was formed in 2012 and manufactures, sells, and distributes a unique type of handbag, called Sash Bags, and other retail products. The Sash Bags are sold directly to customers through its website and Amazon.

5. Historically, the Debtor used a manufacturing partner located in India to directly manufacture its products pursuant to purchase orders ("POs"). The Debtor would pay the manufacturer a 50% deposit when a PO was submitted and pay the balance when the products were shipped. Once the products were ready to be shipped, the Debtor would put the product on the websites for sale. The Debtor then shipped the products to a warehouse in San Diego and a fulfillment center in British Columbia, Canada. The products were shipped directly to the customers from the warehouses located in San Diego and Canada once purchased by customers on the websites.

6. In an effort to reduce the cost of goods sold ("COGS"), the Debtor entered into a contract with Manufactured Networks Inc. ("MFD") to provide manufacturing

logistics services in or around June of 2022. The Debtor would submit POs to MFD and MFD was supposed to ensure that the products were produced and shipped to the Debtor in a timely fashion. MFD did not require payment in full when the POs were completed and shipped.

7. The Debtor and MFD experienced a substantial disconnect on pricing and fees from the very beginning of the relationship. A dispute later arose between the Debtor and MFD regarding operational issues, such as delays for receiving the "Sash" products, the Debtor being required to submit new POs for its products where it previously submitted POs for those same products but went unfulfilled, and the fees and costs from the performed POs. As a result, MFD stopped accepting new POs and stopped shipping the performed POs without cash on delivery.

8. As an attempt to "restart" the relationship, the parties entered into a new agreement entitled "Master Goods and Services Supply – Secured and FBO Agreement" on December 6, 2023 (the "FBO Contract").

9. Thereafter, a subsequent dispute arose between the parties about payment, cash application, and reconciliation of amounts due.

10. From October through December 2024, the parties continued to entertain discussions regarding settlement of the dispute, but no resolution was reached.

11. In or around March 2025, the Debtor again attempted to negotiate a resolution with MFD. However, soon thereafter, MFD swiftly moved to foreclose on its security interest and sent a private sale notice to Debtor. In response, the Debtor filed this bankruptcy case prior to the expiration of the private sale date.

12. The parties have several pending matters and controversies in the underlying bankruptcy case and the adversary relating to the claim held by MFD, as follows:

- The Debtor and MFD dispute the amount of MFD's true claim.
- MFD seeks allowance to file a late proof of claim after missing the deadline to file a claim. MFD filed a *Motion for Entry of an Order: (1) Authorizing Filing of Proof*

*of Claim After Bar Date and Deeming it to Have Been Timely Filed, Or Altering Bar Date; or, Alternatively (2) Deeming Manufactured Networks, Inc. to Have Timely Filed an Informal Proof of Claim and Authorizing Filing of Proof of Claim as Timely Amendment Thereto* on October 15, 2025 [Docket No. 179]; the Debtor filed an *Opposition* on November 24, 2025 [Docket No. 217].

- While the Debtor was waiting for MFD to produce documents that were required by the Debtor's forensic accountant to produce a report to allow the parties to proceed to mediation, MFD filed an adversary proceeding against the Debtor. The Debtor sought production from MFD pursuant to the order on a 2004 examination [Docket No. 153], which required to Debtor to file and serve a notice of subpoena [Docket No. 155]. MFD filed a *First Amended Complaint for (1) Determination of Validity, Priority or Extent of Security Interest, Lien and Interest in Estate Property; (2) Declaratory Relief* against the Debtor on August 12, 2025 [Docket No. 5 in Adv. No.: 3:25-ap-90097-CL]; the Debtor filed an *Answer* on May 29, 2026 [Docket No. 34].
- MFD is also holding products with the Sash trademark, located at a warehouse in Valencia, California (the "Valencia Warehouse") that it now seeks to sell. MFD filed a *Motion for Entry of an Order Authorizing Manufactured Networks, Inc. to Sell Inventory Not Purchased or Owned by the Debtor and Granting Relief from the Automatic Stay to the Extent the Automatic Stay Applies to Sell Inventory that Does Not Belong to the Debtor* on November 17, 2025 [Docket No. 209]; the Debtor filed a *Limited Opposition* on December 1, 2026 [Docket No. 228]. Concurrently, MFD filed a *Motion for Relief from Automatic Stay – Personal Property* on November 17, 2025 [Docket No. 212]; the Debtor filed an *Opposition* on December 1, 2026 [Docket No. 226].
- The Debtor's management formed a third-party manufacturing and sourcing company from which the Debtor can purchase inventory. The Debtor filed a *Notice*

*of Intended Action and Opportunity for Hearing to Seek Allowance of Compensation or Remuneration to Debtor(s) or Insiders as Provided by LBR 4002-2* on December 19, 2025 [Docket No. 242]; MFD filed an *Opposition* on January 23, 2026 [Docket No. 264].

- Debtor and MFD attended several full-day mediations in December 2025 in an attempt to work out a framework for settlement. The settlement discussions did not ultimately result in a settlement, but did create an alignment on structure.

13. The Debtor and MFD have extended/continued the deadlines/hearings several times while the parties have continued negotiations of the Term Sheet.

14. Financially, the Debtor has struggled for a variety of reasons postpetition. Early in the case, the Debtor had difficulty paying for and running ads for a few weeks when it had to close its prepetition accounts and open DIP accounts as the bank to which it opened the DIP accounts would not issue a debit card, along with other account restrictions. Historically, the Debtor paid for all its advertising/marketing with a card.

15. As a result, the Debtor had to open DIP accounts at another bank that would issue debit cards, which was issued a few weeks after the accounts were opened. As such, this prevented the Debtor from adequately advertising/marketing the Sash Products for the first month of the case and it was stuck in a vicious cycle where it did not have sufficient working capital to pay them. I believe that advertising/marketing is critical to the success of the business as the Debtor believes that the more it spends for this purpose, the more sales it can generate. The Debtor relies on repeat customers, and the ads are the most efficient means to show what new products the Debtor can offer. As such, the Debtor has not met projected cash collateral budget as to advertising/marketing, which I believe has directly caused lower than projected sales.

16. Concurrently, the Canadian Fulfillment allegedly held a warehouseman lien on the Debtor's products located at its facility and would not allow the Debtor to sell those products until its prepetition claim was paid in full. The fulfillment center held

approximately 5,721 Sash Bags and other non-Sash Bags inventory with a retail value of $212,656.10. After the parties entered into a settlement to resolve the issues, the Debtor timely filed a motion to approve settlement [Docket No. 107]; thereafter MFD filed an opposition [Docket No. 121], which significantly contributed to the delay of the consummation of the settlement until early October.

17. As to the ordering and selling of the new products, the Debtor reverted back to its model of ordering directly from the manufacturer(s), generally from India. However, there were considerable delays with ordering new products as it did not have the working capital to make those purchases. The Debtor did not receive any new products until July or August 2025. As such, the Debtor was forced to sell only what it had on hand during this period, which was significantly limited.

18. Additionally, Debtor has been also drastically affected by the tariffs unilaterally imposed by the United States on India and other foreign nations. As a result, the Debtor had to find other means to get its products as it could no longer afford the order directly from an overseas manufacturer; the additional 50% tariffs brought its total duties to 63.5%.

19. The Debtor has entered into a settlement term sheet with MFD and me that intends to globally resolve all the pending issues. Those terms and conditions are set forth in the Settlement Agreement Term Sheet (the "Term Sheet") between the parties. Attached as **Exhibit "A"** is a true and correct copy the Term Sheet. I have carefully reviewed the Term Sheet.

20. I believe that the parties will enter into a definitive agreement to the Term Sheet prior to the hearing on this Motion. However, the parties desire to disclose the general terms of the settlement and move the case forward. As such, the Term Sheet is serving as a proxy while the agreement is finalized. The Debtor will file a supplement to this motion with the fully executed agreement when completed.

///

21. The core issue in dispute is the amount of MFD's claim and the conduct during the performance of the agreement. As such, I believe that MFD has and will continue to fervently pursue its claims against the Debtor. As a result, the Debtor has incurred significant administrative fees and will continue to accrue significant fees absent a settlement. Even if the Debtor does prevail, the continued cost to litigate will render it administratively insolvent and unable to propose a feasible amended Chapter 11 plan of reorganization.

22. More importantly, the Debtor simply does not have the resources to continue to litigate as sales have been slow postpetition as shown by the monthly operating reports, and I believe that settling with MFD is the only way forward for the business.

23. In my business judgment, I believe that the upside in potentially prevailing does not significantly outweigh the potential downside with the cost of continuing to litigate with MFD as it will only be a Pyrrhic victory.

24. As part of the settlement, the Debtor is allowing MFD to operate, manufacture, sell, and distribute its products, and to use its all associated intellectual property for three years with two one-year options. In exchange, the Debtor is getting monthly royalties of not less than $5,000 per month or 10% of the gross revenue each month, whichever is more.

///

///

///

///

///

///

///

///

///

25. Those payments will be used to fund an amended Chapter 11 plan of reorganization. Otherwise, the Debtor is currently not generating sufficient revenue or disposable income to propose a feasible plan based on the estimated administrative claims and the priority claims.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed this _______________, 2026, at ______________________, California.

By: See next page

Nichole Macdonald
***Declarant***

25. Those payments will be used to fund an amended Chapter 11 plan of reorganization. Otherwise, the Debtor is currently not generating sufficient revenue or disposable income to propose a feasible plan based on the estimated administrative claims and the priority claims.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed this August 3, 2026, at San Diego, California.

By: [signature]
Nichole Macdonald
***Declarant***

# EXHIBIT "A"

**SETTLEMENT AGREEMENT TERM SHEET**
**BETWEEN SASH GROUP, INCORPORATED AND MANUFACTURED NETWORKS, INC.**

**JULY 10, 2026**

This TERM SHEET ("**TERM SHEET**") entered into on this date ("**EFFECTIVE DATE**") July 10, 2026, summarizes the principal terms of the settlement agreement reached by and between Sash Group Inc., a California Corporation ("**SASH**") located at 12899 Flintwood Way, San Diego, CA 92130, Nichole MacDonald, and Manufactured Networks Inc., a Delaware corporation located at 933 N. La Brea Ave., West Hollywood, CA 90038, or its assignee (together, "**MFD**') (each a "**PARTY**" and, together, the "**PARTIES**"). This TERM SHEET and a written Settlement Agreement memorializing its terms are subject to Bankruptcy Court approval and shall establish a binding term sheet between the PARTIES upon Bankruptcy Court approval. The Debtor shall seek Court approval of this Term Sheet and a written Settlement Agreement memorializing its terms. To the extent permitted by applicable law, as and to the extent the Parties are unable to reach agreement on a written Settlement Agreement, this Term Sheet shall be deemed to constitute the written Settlement Agreement and the Debtor shall seek Court approval of this Term Sheet as the final written Settlement Agreement between the Parties.

**SETTLEMENT TERMS**

| | |
|---|---|
| **Current Claims** | Below are the current claim amounts as asserted by the PARTIES.<br>• MFD Asserted Secured Claim - $4,662,370.80<br>• SASH Proposed Secured Claim - $2.0M<br>• Settled Secured Claim Amount - $2.325M plus all accrued and unpaid interest thereon at a rate of 8% compounded quarterly from the Effective Date until paid or deemed satisfied pursuant to this Agreement (the "Agreed Claim") which shall be secured by liens against all assets of SASH, including, without limitation, all intellectual property, customer lists, and sales channels, which is senior in priority to all other liens except the liens of the U.S. Small Business Administration. Upon any uncured event of default by SASH, the Agreed Claim shall automatically revert to $4,662,370.80, plus all accrued and unpaid interest therein at the same rate, from the Effective Date until paid in full. |
| **License, Claim Amount, Payment** | SASH and Ms. MacDonald shall grant MFD[1] an exclusive, worldwide, three (3) year license to operate manufacture, sell, and distribute and to use all associated intellectual property, including trademarks, copyrights, and customer lists, subject to Brand Guidelines (the "License"), provided, however, that to the extent the |

[1] As set forth above, MFD is defined to include any designated assignee, which, if so designated, shall have all rights and obligations set forth herein.

| | |
|---|---|
| | Agreed Claim with interest is not satisfied in full within the initial three year license term, MFD shall be entitled to two (2) one (1) year options (collectively, the "License Term") for MFD to extend the term of the License, in satisfaction of the Agreed Claim plus interest during the License term, except for the amount otherwise agreed to herein. The Agreed Claim including accrued interest, shall be deemed satisfied solely upon full performance by MFD through the License Term.<br><br>MFD shall remit to SASH on a monthly basis the Royalty Payment (as such term is defined below).<br><br>• Default – Standard default provisions shall apply, including the Default provisions herein below, non-competition as set forth below during the License Term and mutual non-disparagement agreements. Default by Sash shall cause snapback to full amount owed by SASH at MFD's Asserted Secured Claim of $4,662,370.80 plus accrued and unpaid interest. Upon any uncured Event of Default by SASH, (i) the Agreed Claim shall automatically and without further action revert to $4,662,370.80 plus accrued interest, (ii) MFD may terminate the License at its option, and (iii) MFD shall be entitled to immediately exercise all rights and remedies available to a secured creditor under applicable law. For example, default by SASH shall result in rights and remedies available under the UCC with any applicable stays under section 362 shall be deemed to have been lifted and/or modified. Any patents, marks or other intellectual property, as disclosed on Schedule A now held or in the future held by any individual or entity pertaining or related to, or in connection with SASH or SASH bag products, shall be exclusively licensed to MFD as set forth above.<br>• Non-competition – During the License Term only, SASH shall not, directly or indirectly through any affiliate or insider of SASH or entity controlled by SASH, manufacture, market, sell or distribute any SASH-branded products, products that are competitive with or similar to any products produced, marketed or sold under the SASH brand as of the Effective Date, or any products marketed as confusingly similar substitutes for SASH-branded products, except as expressly permitted by this Agreement or approved in writing by MFD. For the avoidance of doubt, this restriction is intended solely to protect MFD's exclusive operational License during the License Term and shall not restrict (i) Nichole MacDonald or any other individual from obtaining employment, consulting, or other work (provided that such employment, consulting, or other work does not interfere with the License); (ii) any |

| | |
|---|---|
| | activity that does not involve the use of the SASH brand; (iii) any activity after expiration or termination of the License Term; or (iv) any product, business, or service that is not marketed under the SASH brand or as a confusingly similar substitute for SASH-branded products. |
| **Term of License** | • The Term of the License shall be thirty-six (36) months, subject to MFD's two 1-year options, commencing on the date of entry of a final, non-appealable Court order approving this Term Sheet and the written Settlement Agreement memorializing its terms (the "Final Order"). |
| **Royalty** | • Commencing on the date that is six months after entry the Final Order, MFD shall pay SASH the greater of a royalty of 10% or $5,000 of the gross monthly revenue each month. (the "Royalty Payment"). The Royalty Payment shall be due and payable within thirty days of the closing of the month (for example, the Royalty Payment for January will be due and payable thirty days after the end of January). Notwithstanding the foregoing, during the first six (6) calendar months following entry of the Final Order, MFD shall pay to SASH a monthly royalty of $5,000 per month.<br>• Gross revenue shall be defined as total revenue received from sales of SASH-branded products, without deduction except for refunds, chargebacks, and sales taxes.<br>• For the avoidance of doubt, MFD shall not be responsible for the payment of any of SASH's debts or creditors and any debts incurred by SASH during the term of this Agreement or otherwise shall not constitute the obligations of MFD. |
| **Deemed Satisfaction of Claim** | • Upon expiration of the License Term (including MFD's two (2) one (1) year options), MFD's Agreed Claim and Claim Amount shall be deemed paid, satisfied, and discharged in full, and Sash shall have no further obligation to MFD.<br>• Upon the expiration of the License Term and the satisfaction of MFD's obligations, all liens held by MFD against Sash's assets shall be immediately and automatically released. A UCC-3 termination statement will be executed upon signing the definitive agreement and held in escrow for the automatic release upon expiration of the term. |
| **Sales Channels** | • MFD will be permitted to use all Sales Channels, subject to Brand Guidelines. |
| **Design and New Products** | • MFD may produce products under the SASH name subject to agreed upon brand guidelines which shall be proposed by SASH at its own expense within thirty (30) days of execution of this Agreement |

| | |
|---|---|
| | • If MFD elects to develop and/or produce additional product, they may do so at their own cost and expense subject to agreed upon brand guidelines.<br>• SASH and MFD will work to reach agreement on applicable brand guidelines within 30 days of execution of this Term Sheet. If the Parties are unable to agree within thirty (30) days, the Brand Guidelines shall be based on commercially reasonable standards consistent with prior SASH practices, and in no event shall failure to agree delay or impair the effectiveness of this Agreement.<br>• Subject to agreed upon brand guidelines, MFD may create new "styles" of products with same protections as above for SASH. - MFD may create new products that are sold with the same guidelines.<br>• "SASH Background IP" means all right, title, and interest in any intellectual property, designs, marketing material, works, derivative works, know-how and sales channels, customer contacts and lists, and customer accounts related to SASH brand that exist as of the effective date of the definitive agreement.<br>• All Sash Background IP shall be owned exclusively by SASH.<br>• "MFD Foreground IP" means specific product designs, creative assets, marketing materials (excluding SASH's Legacy Customers, customer lists, sales channels, and accounts) that are (i) originated solely by MFD during the License Term, without incorporation of pre-existing SASH IP beyond what is necessary in brand guidelines; and (ii) identified on a schedule in the Definitive Agreement. MFD shall have the economic rights in such MFD Foreground IP as set forth in the definitive agreements.<br>• During the License Term, SASH will grant MFD a limited license to SASH Background IP.<br>• "Legacy Customer" shall mean all customers and contract that (i) made a purchase from, or were on the marketing lists of SASH prior the Effective Date, or (ii) first transacted through a SASH-controlled channel during the License Term.<br>• "MFD-Originated Customers" means customers and contacts that (i) had no purchase history with, or marketing relationship to, SASH prior to the Effective Date, and (ii) first transacted solely through an MFD-controlled Sales Channel during the License Term.<br>• All sales channels, storefronts, domains names, and customer accounts (except for MFD-Originated Customers) created or operated under the SASH brand to the extent created or operated for the sale or marketing of SASH-branded |

| | |
|---|---|
| | products during the License Terms shall be deemed assets of SASH, and subject to the License, shall revert to SASH upon expiration of the License Term. |
| **Brand Management Consulting Agreement** | • Contemporaneously with the Effective Date, MFD shall enter into a consulting agreement with Nichole MacDonald for brand guidance, marketing, including live sales and community outreach on existing social media groups on platforms under such terms and conditions as will be determined in a Definitive Agreement, with a term not to exceed six months, subject to the parties' mutual agreement to extend such term. To the extent a Definitive Agreement is not reached, this Term Sheet shall govern and compensation shall be $6,000 per month, and the scope shall be limited to advisory services related to brand guidance and marketing. Consultant shall have no authority over operations, pricing, vendor selection, or business strategy, except as expressly requested by MFD. MFD may terminate the consulting agreement upon thirty (30) days' notice. Any additional personnel or hires shall be subject to separate mutual agreement and shall not be required under this Agreement. |
| **Insurance and Indemnification** | • MFD will maintain, at its sole expense, a comprehensive general liability and product liability insurance policy with a reputable carrier with limits of at least $2,000,000 per occurrence. The policy must name SASH as an additional insured.<br>• MFD to provide SASH with broad indemnification for any and all third party claims arising from or related to the operation of SASH business and any products manufactured or produced during the License Term. Such indemnification shall be limited to claims arising from MFD's operation of the business during the License Term and shall exclude pre-existing liabilities. |
| **Pre-Term Handoff** | • Upon Bankruptcy Court approval of a Definitive Agreement, MFD will not object to the use of cash collateral to pay for ordinary and necessary operating expenses, and insider compensation upon the terms presently proposed in SASH's insider compensation requests filed with the Bankruptcy Court. MFD's motion to allow late claim will be deemed granted in accordance with and subject to this agreement (i.e., in the Agreed Claim amount), and MFD's motion for authority to sell the Valencia Inventory will be deemed granted, subject to the terms of this Agreement. Additionally, SASH will withdraw its subpoena and any other document requests and MFD will dismiss the adversary proceeding. MFD will dismiss the state court proceeding. |

| | |
|---|---|
| | • "Handoff Inventory" shall mean all finished goods inventory in SASH's possession or control as of the Effective Date.<br><br>• "Handoff Orders" shall mean all open purchase orders placed with manufacturers by or on behalf of SASH on or before the Effective Date.<br>• Optional Consignment Acquisition - MFD may, in its sole discretion, elect to take possession of all or any portion of the Handoff Inventory for sale on a consignment, pay as sold basis at SASH's documented cost of goods sold ("COGS"), as evidenced by reasonable supporting documentation.<br>• Title to the Handoff Inventory shall remain with SASH until such time as individual units are sold in the ordinary course of business by MFD, at which time title to such sold units shall automatically transfer to MFD solely for purposes of completing such sale.<br>• MFD shall have no obligation to purchase any minimum quantity of Handoff Inventory and shall have no liability for any unsold inventory.<br>• Payment Terms - Payment for each unit sold shall be remitted to SASH at the documented COGS pricing within thirty (30) days following the end of the calendar month in which such unit is sold.<br>• "Documented COGS" shall mean direct manufacturing cost, freight, duties, and taxes actually paid by SASH, and shall not include overhead allocations, administrative expenses, interest, markups, or intercompany charges.<br>• Transfer; Storage; Risk - Upon MFD's election, the applicable Handoff Inventory shall be transferred to MFD. MFD shall bear the cost of storage and insurance for inventory in its possession.<br>• Risk of loss shall transfer to MFD upon physical delivery; provided, however, that MFD shall not be responsible for any latent defects, non-conforming goods, or pre-existing damage.<br>• No Encumbrances - SASH represents and warrants that the Handoff Inventory is free and clear of all liens, claims, and encumbrances (other than the SBA lien, if applicable), and SASH shall indemnify MFD against any third-party claims relating to pre-transfer obligations.<br>• Handoff Orders - If MFD elects to acquire any portion of the Handoff Inventory, MFD may, in its sole discretion, assume and step into the shoes of SASH with respect to some or all Handoff Orders.<br>• Upon such election: SASH shall assign such Handoff Orders to MFD. MFD shall be responsible only for costs incurred after the date of assignment. MFD shall have no liability for |

| | |
|---|---|
| | any pre-assignment obligations, breaches, deposits, or claims.<br>• SASH shall remain responsible for all obligations arising prior to assignment.<br>• Any inventory that remains, shall be subject to the Reversion Inventory term in this Agreement. |
| **<u>Steering Committee</u>** | • SASH and MFD will identify a three-person steering committee to handle operational items related to Pre-Term Handoff and License Term Expiration. The steering committee will meet and confer at least once per quarter throughout the License Term for the purposes of review, planning, and general oversight.<br><br>• SASH and MFD will be permitted to appoint one person to the Steering Committee, except that Pranay Srinivasan shall not be permitted to join the Steering Committee. The SASH and MFD representatives shall mutually agreed upon a third, independent member.<br>• If the Steering Committee reaches a deadlock, the disputed matter shall be escalated to individuals with appropriate decision-making authority of SASH and MFD, who shall have ten (10) days to confer and resolve the issue in good faith. If they are unable to reach a resolution, the issue shall be submitted to arbitration by a single, mutually agreed-upon neutral.<br>• Reporting. During the License Term, MFD shall provide to SASH (through the Steering Committee) quarterly summary reports showing: (i) gross revenue from SASH branded products, (ii) Royalty Payments made, (iii) payments applied to the Agreed Claim and accrued interest, and (iv) remaining outstanding balance of the Agreed Claim.<br>• Such reports shall be provided within thirty (30) days following the end of each calendar quarter.<br>• The Steering Committee shall have the right, upon at least thirty (30) days' prior written notice and no more than twice in any twelve (12)-month period, to review relevant books and records of MFD solely to verify: (i) the calculation of Royalty Payments, (ii) amounts applied to the Agreed Claim and accrued interest, and (iii) calculations relating to Reversion Inventory and Reversion COGS Amounts. Such review shall: Occur during normal business hours. Be conducted by an independent CPA or financial advisor. Be limited to financial records directly related to the foregoing items. Not include access to trade secrets, unrelated business information, proprietary systems architecture, customer data |

| | |
|---|---|
| | unrelated to SASH branded products, or other competitively sensitive information<br>• All information obtained through such review shall be treated as confidential and may not be used for any purpose other than verifying compliance with this Agreement.<br>• The cost of any review shall be borne by SASH unless the review reveals an underpayment of more than three percent (3%) for the period reviewed, in which case MFD shall reimburse SASH for the reasonable, documented cost of such review.<br>• For the avoidance of doubt, the Steering Committee shall have no authority over operational decisions, pricing decisions, marketing strategy, vendor selection, inventory management, or other day-to-day management of the SASH business, all of which shall remain within the sole discretion of MFD during the License Term.<br>• Dispute Resolution. If a dispute arises regarding any calculation, the parties shall first attempt to resolve the matter in good faith. If unresolved within fifteen (15) days, the dispute shall be submitted to a mutually agreed independent accounting firm for final determination, the cost of which shall be allocated consistent with the materiality threshold above. |
| **Expiration and Reversion** | • Upon the expiration of the License Term, subject to the MFD IP Interests, MFD's license shall automatically terminate at 11:59 p.m on the 36-month anniversary, or, if MFD exercises its options at least 90 days before the then-current expiration date on the 48-month or 60-month anniversary, as the case may be (the "Term Expiration Date").<br>• Upon the Term Expiration Date, the parties will conduct an accounting of all Open Purchase Orders, which are any purchase orders where MFD requested the manufacture of Goods but are incomplete.<br>• "Remaining Inventory" shall mean all in-stock inventory on hand as of the Term Expiration Date.<br>• The Goods subject to Open Purchase Orders and Remaining Inventory are called "Reversion Inventory".<br>• MFD shall provide documentation establishing the total COGS for such Reversion Inventory ("Reversion COGS Amount")<br>• Reversion of Business - Upon reversion, SASH shall issue to MFD an equity stake of 25% in SASH (the "MFD Equity Interest") as consideration for the value, including the MFD IP Interests, created during the License Term. SASH shall have the right, exercisable at any time following reversion, to repurchase the MFD Equity Interest at a price determined by |

| | |
|---|---|
| | an independent third-party valuation conducted by a mutually agreed-upon appraiser (the "Buyout Valuation"). If the parties cannot agree on an appraiser within fifteen (15) days of SASH's election to exercise the buyout right, each party shall select one appraiser and the two shall jointly select a third, whose determination shall be final and binding. The buyout price shall be paid in cash within thirty (30) days of the final Buyout Valuation. For the avoidance of doubt, upon the Reversion Date, all SASH Background IP shall revert to SASH's sole control. SASH's reacquisition of such IP and data rights shall be conditioned upon the issuance of the MFD Equity Interest to MFD pursuant to Section []. Until such condition is satisfied, MFD's rights in the MFD IP Interests and MFD Data Assets shall remain in full force.<br>• All proceeds from sales occurring after the Term Expiration Date shall be deposited into a SASH-controlled account, subject to the payment obligations set forth herein.<br>• "Reversion Inventory" shall mean (i) all finished goods inventory remaining in stock as of the Term Expiration Date and (ii) goods subject to Open Purchase Orders that are completed after such date.<br>• Consignment Treatment of Reversion Inventory - All Reversion Inventory shall be transferred to SASH on a consignment, pay-as-sold basis.<br>• Title to Reversion Inventory shall remain with MFD until such time as individual units are sold by SASH in the ordinary course of business, at which time title to such sold units shall automatically transfer solely for purposes of completing such sale.<br>• SASH shall not pledge, encumber, discount, or otherwise dispose of Reversion Inventory except in the ordinary course of retail sales.<br>• For each unit of Reversion Inventory sold, SASH shall remit to MFD : (i) the documented Reversion COGS Amount attributable to such unit; and<br>(ii) the agreed royalty percentage attributable to MFD IP Interests, if applicable.<br>• Payment shall be made within thirty (30) days following the end of the calendar month in which such unit is sold.<br>• "Reversion COGS Amount" shall mean direct manufacturing cost, freight, duties, and taxes actually paid, and shall not include overhead allocations, administrative costs, marketing expense, fulfillment costs, or other internal charges.<br>• Storage and Risk -Upon transfer of operational control, SASH shall bear all costs of storage, marketing, fulfillment, and insurance of Reversion Inventory in its possession. |

| | |
|---|---|
| | • Risk of loss shall transfer to SASH upon physical transfer of the inventory.<br>• For avoidance of doubt, e SASH shall not retain any fixed percentage of gross revenue prior to payment of the Reversion COGS Amount and applicable royalty.<br>• Audit and Reporting<br>• SASH shall provide monthly sales reports detailing units sold, gross revenue, discounts applied, and payments due to MFD.<br>• MFD shall have audit rights consistent with the financial verification provisions of this Agreement.<br>• During the License Term, MFD may use MFD-Originated Customer data solely to operate the SASH business in accordance with the definitive agreements and the Brand Guidelines. The definitive agreement will specify each party's rights to retain and use MFD-Originated Customer data after the Term Expiration Date, including any limitations on marketing SASH-branded or confusingly similar products to such customers. |
| **No Purchase Right** | • All goodwill generated by MFD during the License Term shall inure to the benefit of SASH and revert as part of the business. |
| **Defaults** | • A failure by MFD to make any required payments under this Agreement to SASH, not cured within 10 days of notice, shall constitute a material default.<br>• Any default by SASH, including with respecting to interference with MFD's rights under this agreement, disparagement of MFD, shall constitute a material default by SASH and shall result in snapback to full amount owed by SASH at MFD's Asserted Secured Claim amount. Failure to cure default (if possible to cure) within 10 days of notice thereof shall result in rights and remedies available under the UCC with any applicable stays under section 362 shall be deemed to have been lifted and/or modified as set forth above |
| **Expenses and Other Terms** | • Standard default, non-disparagement and confidentiality clauses<br>• Upon the Term Expiration Date, MFD shall permanently destroy all copies of customer lists and associated data in its possession, custody, or control and provide a written certification of such destruction to Sash upon request.<br>• Individual suits against MacDonald and Smith shall be stayed upon signing the Term Sheet and will be dismissed with prejudice on the effective date of the confirmed Chapter 11 plan.<br>• All pre-petition agreements between Sash and MFD will be terminated. For clarity, neither Sash nor its principals shall |

| | |
|---|---|
| | be bound by the non-circumvention clauses of the agreements. Notwithstanding the foregoing, SASH, Ms. MacDonald, and controlled entities, affiliates and insiders thereof,shall remain subject only to the in-term non-competition expressly set forth above during the License Term, and no such restriction shall apply after the expiration or termination of the License Term..<br>• Subject to the above provision, mutual and general releases between MFD and SASH except for the parties' obligations under this Term Sheet and the Settlement Agreement.<br>• The terms of this Term Sheet shall be memorialized in a written Settlement Agreement and SASH shall file a motion in a form and manner reasonably acceptable to MFD promptly after signing of a Settlement Agreement requesting bankruptcy court approval of the Settlement Agreement and shall calendar such motion for hearing on the first available hearing date available. The terms of this Term Sheet and Settlement Agreement shall be incorporated into a chapter 11 plan of reorganization in a form and manner reasonably acceptable to MFD. To the fullest extent permitted by applicable law, and it being the express intent of the Parties that this Term Sheet constitutes a binding and enforceable agreement, as and to the extent the Parties are unable to reach a definitive written Settlement Agreement, this Term Sheet shall constitute the final written Settlement Agreement, shall be binding and enforceable and the Debtor shall seek Court approval of this Term Sheet as the final definitive Settlement Agreement between the Parties and incorporate such terms in the Debtor's chapter 11 plan of reorganization. For the avoidance of doubt, the enforceability of this Term Sheet and a written Settlement Agreement shall not be conditioned upon the confirmation of a chapter 11 plan in the Debtor's bankruptcy case. |

This Term Sheet shall be governed in all respects by the laws of California. This Term Sheet, and the definitive Settlement Agreement into which it will be incorporated, constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements, understandings, negotiations, and discussions oral or written.

.

**SASH GROUP, INCORPORATED**

By: ___________________________

Name: ________________________

| | |
|---|---|
| | be bound by the non-circumvention clauses of the agreements. Notwithstanding the foregoing, SASH, Ms. MacDonald, and controlled entities, affiliates and insiders thereof,shall remain subject only to the in-term non-competition expressly set forth above during the License Term, and no such restriction shall apply after the expiration or termination of the License Term.. <br>• Subject to the above provision, mutual and general releases between MFD and SASH except for the parties' obligations under this Term Sheet and the Settlement Agreement. <br>• The terms of this Term Sheet shall be memorialized in a written Settlement Agreement and SASH shall file a motion in a form and manner reasonably acceptable to MFD promptly after signing of a Settlement Agreement requesting bankruptcy court approval of the Settlement Agreement and shall calendar such motion for hearing on the first available hearing date available. The terms of this Term Sheet and Settlement Agreement shall be incorporated into a chapter 11 plan of reorganization in a form and manner reasonably acceptable to MFD. To the fullest extent permitted by applicable law, and it being the express intent of the Parties that this Term Sheet constitutes a binding and enforceable agreement, as and to the extent the Parties are unable to reach a definitive written Settlement Agreement, this Term Sheet shall constitute the final written Settlement Agreement, shall be binding and enforceable and the Debtor shall seek Court approval of this Term Sheet as the final definitive Settlement Agreement between the Parties and incorporate such terms in the Debtor's chapter 11 plan of reorganization. For the avoidance of doubt, the enforceability of this Term Sheet and a written Settlement Agreement shall not be conditioned upon the confirmation of a chapter 11 plan in the Debtor's bankruptcy case. |

This Term Sheet shall be governed in all respects by the laws of California. This Term Sheet, and the definitive Settlement Agreement into which it will be incorporated, constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements, understandings, negotiations, and discussions oral or written.

**SASH GROUP, INCORPORATED**

By: [signature]

Name: Nichole MacDonald

Manufactured Networks, Inc.
933 N. La Brea Ave., Suite 200
West Hollywood, CA 90038

Title: CEO

Date: 7/13/26

**NICHOLE MACDONALD**

______________________

Date: 7/13/26

**MANUFACTURED NETWORKS, Inc.**

By: ______________________

Name: ______________________

Title: ______________________

Date:

Manufactured Networks, Inc.
933 N. La Brea Ave., Suite 200
West Hollywood, CA 90038

Title: ______________________________

Date:

**NICHOLE MACDONALD**

_________________________

Date:

**MANUFACTURED NETWORKS, Inc.**

By: See next page__________________

Name: ________________________

Title: ______________________________

Date:

Title: ____________________________

Date:

**NICHOLE MACDONALD**

________________________

Date:

**MANUFACTURED NETWORKS, Inc.**

By: ________________________ Signed by: Robert Brown 316174AB5F5C4DA...

Name: Robert Brown

Title: Authorized Representative

Date: July 15, 2026